IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

WELLS FARGO BANK, N.A., as
Securities Intermediary;

Plaintiff,

vs.

AMERITAS LIFE INSURANCE CORP.,

Defendant.

**4:21CV3118**

**MEMORANDUM AND ORDER**

Plaintiff Wells Fargo Bank, N.A., moves to compel production of documents listed on a privilege log created by Defendant Ameritas Life Insurance Corporation. (Filing No. 120). Ameritas moves to compel Wells Fargo and Vida Longevity Fund LP ("Vida") to produce documents requested in Ameritas' written Requests for Production. (Filing No. 114). And the parties jointly move to continue the case progression deadlines to dates beyond the ruling on the parties' discovery motions. (Filing No. 166). For the reasons stated below, Ameritas' motion to compel will be granted, Wells Fargo's motion to compel will be granted in part, and the parties' motion to modify the case progression schedule will be granted.

CLAIMS AND DEFENSES

Under Rule 26(b)(1) of the Federal Rules of Civil Procedure, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. . . ." Fed. R. Civ. P. 26(b)(1). The following claims and defenses are raised in the parties' pleadings.

Wells Fargo filed this lawsuit in its capacity as the "Securities Intermediary" for its client, Vida.[1] The complaint alleges Union Central Life Insurance Company, an Ameritas predecessor, issued a $4 million life insurance policy on September 8, 2008, payable upon the death of Jerry Freid, a New Jersey resident. (the "Freid Policy"). (See, Filing No. 140-5). The Jerry Freid Irrevocable Trust was the original beneficiary. The producer of the Freid Policy was James Kergil; the broker-general-agent was Michael Binday (and his company, R. Binday Plans and Concepts); and the owner was the Trust c/o Michael Block, as trustee. (Filing No. 140-5, at CM/ECF p. 28).

The Trust's rights under the policy were transferred to the Securities Intermediary on May 12, 2011. Teleios LS Holdings DE, LLC was the beneficial owner of the policy when it was sold to Vida on December 28, 2017. Vida is the current beneficial owner of the policy.[2]

After Jerry Freid died on July 29, 2020, the Securities Intermediary submitted a death claim to Ameritas, but Ameritas refused to pay on the policy. Ameritas claims the Freid policy is a stranger originated life insurance ("STOLI") policy and therefore unenforceable and void ab initio. Wells Fargo asserts Ameritas must pay the face value of the policy or, in the alternative, the policy

---

[1] As in Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A., 44 F.4th 1024, 1040 (7th Cir. 2022), reh'g denied, No. 20-2339, 2022 WL 4463134 (7th Cir. Sept. 20, 2022), this court questions whether Wells Fargo has any standing to pursue this case. But for the purposes of the pending nondispositive motions, the undersigned magistrate judge will assume Wells Fargo is serving as a conduit for asserting Vida's right to a refund of premiums paid.

[2] Based on discussions during the pre-motion discovery conference, the undersigned magistrate judge believes Teleios was the entity that purchased the policy in 2011. However, the Trust may have sold the policy to an unidentified entity in 2011, and the policy was later sold to Teleios, which thereafter sold it to Vida.

Irrespective of the identity of the beneficial owners, Wells Fargo has been the Securities Intermediary for the beneficial owner of the policy since the policy was sold on May 12, 2011. Wells Fargo is now a Securities Intermediary for Computershare with respect to certain life insurance policies, including the policies owned by Vida. The policy on the life of Jerry Freid is one of these Vida-owned policies. (Filing No. 140-7, at CM/ECF p. 2).

premiums paid (totaling $1,054.807.19). Wells Fargo alleges claims against Ameritas for breach of contract, bad faith violation of the covenant of good faith and fair dealing, promissory estoppel, and unjust enrichment. Wells Fargo asserts that as a result of criminal litigation pursued by the government in 2014, (the "Binday Criminal Action"), Ameritas and its predecessor, Union Central, knew the policy may be construed as a STOLI policy, yet it continued to demand and receive premium payments, indicating Ameritas believed the policy was valid and enforceable.

Ameritas acknowledges that in the 2014 Binday Criminal Action, the criminal defendants were found guilty of conspiring to commit and committing mail and wire fraud by making material misrepresentations to life insurance companies, including Union Central, as part of an illegal STOLI scheme. Ameritas admits that the criminal defendants were ordered to pay restitution to Ameritas for losses arising from STOLI policies, including the Freid policy. Ameritas alleges, however, that prior to the New Jersey Supreme Court's ruling in Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A., 208 A.3d 839, 857 (N.J. 2019),[3] it was not aware that STOLI policies violate New Jersey's public policy and constitution, are deemed void ab initio, can never be enforced, and can be challenged by insurers even after the expiration of the policy's two-year contestable period. Ameritas alleges that under Sun Life, Wells Fargo cannot recover the face value of the Freid policy because it is void, and while a truly innocent investor in a STOLI policy may seek a refund of some or all of the premiums paid for a STOLI policy, Wells Fargo's principal, Vida, was not an innocent investor.

---

[3] New Jersey law governs the plaintiff's claims. (Filing No. 131, at CM/ECF p. 4).

In Sun Life, the New Jersey Supreme court held that "a life insurance policy procured with the intent to benefit persons without an insurable interest in the life of the insured . . . violate[s] the public policy of New Jersey, and such a policy is void at the outset." Sun Life, 238 N.J. at 190, 208 A.3d at 859. If a policy is deemed void and unenforceable, a party may be entitled to a refund of premium payments it made on the policy based on equitable principles. Where a party seeks return of premiums, the court must consider all the facts, and balance relevant equitable factors such as the party's level of culpability, its participation in or knowledge of the illicit scheme, and its failure to notice red flags. Id.

In this case, Wells Fargo's complaint alleges that "[t]o the extent the Policy is void, . . . no coverage would have ever attached and, therefore, the premiums paid to Ameritas in connection with the Policy over the past 13 years would not have been earned." (Filing No. 1, at CM/ECF p. 14). Ameritas denies this claim, asserting Vida knew the Freid policy had insurable interest problems when it bought the policy, but it paid the premiums anyway, hoping to ultimately profit from its STOLI wager. In addition to alleging the policy is void, Ameritas alleges Wells Fargo is not entitled to recover the premiums paid, alleging the affirmative defenses of unclean hands, laches, equitable estoppel, equitable fraud, and unjust enrichment.

I.    Ameritas' Motion to Compel

A.  Discovery Requests in Dispute

Ameritas seeks to compel Vida to fully respond to Requests for Production Nos. 2-3, 12, and 29-32, and Wells Fargo to fully respond to Requests for Production Nos. 1 and 22-25. These discovery requests focus on determining

what Wells Fargo and the beneficiaries of the Freid policy knew or should have known when they purchased the policy and as they continued paying policy premiums.

Request 1 served on Wells Fargo demands production of all documents and communications relating to the Insured, the Trust, or the Policy. Requests 2 and 3 served on Vida request all documents relating to acquisition of the Policy, including any purchase and sales agreements or other agreements, drafts of those agreements, any requests for representations, warranties, or indemnifications, and all responses to those requests. (Filing No. 115-4 at CM/ECF p. 6).

In Request 12 served on Vida, Ameritas states that if the Freid policy was within a portfolio of life insurance policies purchased by Vida, Vida must produce documents sufficient to identify whether, and to what extent, the other policies in the portfolio were similar to the Freid Policy, including any life expectancy reports generated for the insureds prior to issuance; whether the policies were procured through non-recourse premium financing, premium financing with put agreements, and/or beneficial interest transfers; whether the policies in the portfolio were originally issued to trusts with the same trustees; and/or whether they were originally issued to trusts created on substantially the same trust agreements. (Filing No. 115-3 at CM/ECF p. 8).

Requests 29 through 32 served on Vida, and Requests 22 through 25 served on Wells Fargo, demand production of all documents showing these entities' knowledge of the insurable interest risks associated with owning STOLI policies, owning policies procured in the mid-2000's through short-term, premium financing programs, owning policies procured through the HM Ruby premium financing program, and owning policies procured or originated through Michael

Binday (including Advocate Brokerage or R. Binday Plans & Concepts), and for each of these topics, when and from whom that knowledge was obtained.

As to the disputed discovery requests, Vida collected and produced its entire policy file for the Fried Policy. After the pre-motion discovery conference with the court, Vida searched the emails of custodians who were involved in administering the Freid Policy and assessing it for possible acquisition (Joseph McCray, Ryan Byrd, Brady Wright, and Daniel Young) for the January 1, 2017 to December 28, 2017 time frame using the following search terms:

> Freid,
> U000044736 (the number for the Freid Policy),
> Ruby,
> Binday,
> Ameritas,
> Union Central, and
> ("New Jersey" OR "NJ") AND "insurable interest"

From this email search, it produced the non-privileged and responsive emails mentioning Freid and/or the Freid policy number, and it produced all documents concerning any analyses, memoranda, or evaluation of any risks associated with owning life insurance policies produced by Michael Binday. The email search did not disclose any preacquisition analyses, memoranda or evaluations of the purported insurable interest risks which mentioned "Ruby," "Ameritas," "Union Central," or ("New Jersey" OR "NJ") AND "insurable interest." (Filing No. 140-1).

As to the disputed discovery requests served on Wells Fargo, as Securities Intermediary, it searched the documents and emails of Christopher Young, Vice President in the Longevity Group within the Securities Intermediary's Corporate Trust Services who oversaw Securities Intermediary's operations. The search was limited to the 2011 through 2020 time frame and to documents containing

the name "Freid" or the number of the Freid Policy. (Filing No. 140-1, at CM/ECF p. 4). Wells Fargo further states:

> Wells Fargo has not prepared and does not possess or maintain any internal analyses of the purported risks to Wells Fargo of acting as a securities intermediary with respect to life insurance policies that lack insurable interest, including the purported risks posed by (1) short-term premium financing programs; (2) the HM Ruby premium financing program; (3) "New Jersey policies and trusts"; (4) policies procured or originated through Michael Binday (including Advocate Brokerage or R. Binday Plans & Concepts); and (5) Ameritas's "litigiousness."

(Filing No. 140-6, at CM/ECF p. 2).  See also Filing No. 140-7, at CM/ECF pp. 3-4).

Vida purchased a portfolio of life insurance policies (the "Alpha Project" portfolio), including the Freid Policy, from Teleios LS Holdings DE, LLC on December 28, 2017. (Filing No. 143-1). Most of the policies were financed by HM Ruby. As to each policy, Vida performed a Tertiary Due Diligence Review. The reviewers referred to the portfolio of policies as "horrendous," and perhaps the "worst overall block we've ever looked at." (Filing No. 118-1, at CM/ECF p. 1).

Wells Fargo and Vida have produced a summary of the conclusions from Vida's due diligence review of the Freid Policy, including the finding that the policy presented a "Moderate" risk, (Filing No. 118-1, at CM/ECF p. 2), but they redacted all the comments, explanations, and documentation supporting those conclusions. (Filing Nos. 118-1; 118-2; 118-3; 143-3). Wells Fargo and Vida also refuse to produce information concerning any policies within the Alpha Project portfolio other than the Freid Policy.

B. Analysis

The Vida and Wells Fargo discovery responses are replete with boilerplate objections (see Filing No. 140-4),[4] but as explained in its brief, Wells Fargo argues, in essence, that both Vida and Wells Fargo have already disclosed all the documents in their possession that they consider relevant. They have not presented evidence to explain the measures and effort required to fully answer the discovery requests as drafted, and how those efforts and associated expenses are disproportionate to the needs of the case. Rather, Vida and Wells Fargo argue that only documents discussing the Freid Policy are relevant, documents for policies other than the Fried Policy and documents reflecting their overall understanding of insurable interest risks are irrelevant, and requiring production of irrelevant documents is disproportionate to the needs of the case.

Ameritas argues the responses by Vida and Wells Fargo are inadequate because these entities improperly redacted key information, used inadequate search methods, and unilaterally chose to limit the date range and scope of their search for responsive documents. It further argues it is entitled to know not only what Vida and the Securities Intermediary knew about the Freid Policy, but also their general knowledge of the risks factors associated with purchasing life insurance policies, including insurable interest risks.

---

[4] The Wells Fargo and Vida discovery responses contain 2½ pages of "General Objections." The responses to individual requests often purport to incorporate, by reference, the General Objections. The General Objections are insufficiently specific to the individual discovery Requests, are therefore improper, and were disregarded by the court. Wagner v. Dryvit Sys., Inc., 208 F.R.D. 606, 610 (D. Neb. 2001). See also, Lynch v. Experian Info. Sols., Inc., 569 F. Supp. 3d 959, 963 (D. Minn. 2021), aff'd, 581 F. Supp. 3d 1122 (D. Minn. 2022); Gowan v. Mid Century Ins. Co., 309 F.R.D. 503, 512 (D.S.D. 2015); St. Paul Reinsurance Co. v. Com. Fin. Corp., 198 F.R.D. 508, 514 (N.D. Iowa 2000).

1) "All documents" disclosing general knowledge of insurable interest risks

Ameritas demands production of "All Documents" showing knowledge of the insurable interest risks associated with:

- owning STOLI policies, when You acquired that knowledge, and the source(s) from whom You acquired it.

- owning policies procured in the mid-2000's through short-term, premium financing programs, when You acquired that knowledge, and the source(s) from whom You acquired it.

- owning policies procured through the HM Ruby premium financing program, when You acquired that knowledge, and the source(s) from whom You acquired it.

- owning policies procured or originated through Michael Binday (including Advocate Brokerage or R. Binday Plans & Concepts), when You acquired that knowledge, and the source(s) from whom You acquired it.

(Filing No. 115-3, RFP 29-32 served on Vida; Filing No. 115-4, RFP 22-25).

Contrary to Wells Fargo's argument, a request to produce "all documents . . ." is not per se overbroad. The description of the documents to be produced can sufficiently limit the scope of a request for "all documents." For example, a request for "all documents" concerning an employee may be overbroad, while a request for "all documents" within an employee's personnel file is not.

Here, the evidence indicates Vida performed a Tertiary Due Diligence Review of the policies within the Project Alpha portfolio purchased by Vida in 2017. The Freid Policy was one of the policies in the Alpha Portfolio. The summary page of the Freid Policy review reveals Vida considered specific criteria and information when assessing the financial risk, including the insurable interest risk, of purchasing life insurance policies being sold. (Filing No. 118-3, at

CM/ECF p. 2).  Ameritas is asking for Wells Fargo's and Vida's documents which explain the risk review criteria and the policy-specific interpretation of those criteria, specifically to include whether, why, and how Vida identified STOLI policies, and considered the risks associated with premium financing and any connection between the policy and H.M. Ruby and/or Binday. The requests also ask for the source of information underlying Vida's adoption of its risk assessment criteria. Applying that context to Ameritas' requests, a search for "all documents" is not overbroad.

Wells Fargo claims discovery concerning Vida's general knowledge of purported "insurable interest risks associated with premium financing is not relevant, and the motion to compel documentation of such knowledge must be denied as disproportionate to the needs of the case." (Filing No. 142, at CM/ECF p. 20). The court wholly disagrees. Vida and Wells Fargo are sophisticated investors. Their general knowledge of the risk when investing in portfolios of insurance policies, and whether they put that knowledge to use when purchasing the Freid Policy, is highly relevant.

Wells Fargo, the Securities Intermediary for beneficial owners of the Freid Policy since May 2011, asserts that it cannot be compelled to further respond to the discovery requests because it "acts solely as securities intermediary for a third-party investor and does not act in its individual capacity." (Filing No. 1, ¶ 7). But Wells Fargo is the named plaintiff, and its unjust enrichment claim does not seek reimbursement of premiums paid only by Vida, the current beneficial owner. The complaint seeks all premiums paid since the policy was issued. While it may not be involved in setting premium rates, issuing policies, or evaluating whether the life insurance policies sold were STOLI policies, Wells Fargo must still look through its records for relevant evidence, or evidence which could lead to the discovery of relevant evidence, dating back to its inception as Securities

Intermediary for the Fried Policy or portfolios containing it, for any records generated by itself or received from the beneficial owners it served.

2)  Analysis underlying the risk assessment of the Freid Policy specifically

As reflected in the summary of its Freid Policy review, when considering whether (and at what price) to purchase the Alpha Project portfolio from Teleios, Vida considered whether the premium payments were financed, the identified beneficiary, the identified trustee, and the state of origin. The facts gleaned during this review are relevant or may lead to discovery of relevant information in deciding whether Vida ignored red flags before purchasing the Freid Policy, particularly when considered in the context of Vida's general and industry knowledge of insurable interest risks. Vida's due diligence review may disclose whether Vida knew or should have known that the policy was a STOLI policy and nonetheless purposefully, recklessly or negligently participated in an illegal scheme by purchasing the policy and continuing to pay its premiums. Sun Life, 238 N.J. at 190, 208 A.3d at 859.

Vida and Wells Fargo argue that Ameritas is entitled to see only Vida's ultimate finding on the risk assessment, and to that end, they unilaterally redacted several pages of the Tertiary Due Diligence Review document. "Redaction is an inappropriate tool for excluding alleged irrelevant information from documents that are otherwise responsive to a discovery request." Affiliated Foods Midwest Coop., Inc. v. SuperValu Inc., No. 8:16CV465, 2018 WL 6177074, at *6 (D. Neb. Nov. 27, 2018) (Nelson, M.J.) (quoting Bartholomew v. Avalon Capital Grp., Inc., 278 F.R.D. 441, 451 (D. Minn. 2011) and collecting cases). Unilateral redactions based on relevance are inappropriate. Id. More importantly, Ameritas is entitled to explore not only Vida's conclusions, but also the facts and opinions it considered, the relative weight afforded to those facts

11

and opinions, and whether it failed to explore or consider material topics or warning signs. Wells Fargo and Vida must produce not only the ultimate conclusions, but all documents reflecting or discussing its due diligence review of the Freid Policy, including but not limited to the areas it redacted from the documents it produced.

3) Comparative Information for Other Policies within the Portfolio

Ameritas requests documents identifying whether, and to what extent, the other policies in the Project Alpha portfolio were similar to the Freid Policy in terms of life expectancy reports at the time of procurement, how the policies were financed, whether there were beneficiary transfers, whether the policies were issued to trusts, and whether the underlying trust documents are similar. Vida argues this information is irrelevant. The court disagrees.

Based on the evidence before the court, Vida reviewed the Project Alpha portfolio and prior to buying it, initially considered it "horrendous." Yet, Vida bought it. By comparing the attributes of the policies within the portfolio, Ameritas may discover the extent and type of policy risks Vida chose to accept—the gamble it was willing to make—in the course of its business dealings.

The due diligence assessments for all the policies within the Project Alpha portfolio will no doubt reveal the standard process performed and facts considered by Vida before it commits to purchasing policies, and Vida's expertise and experience in determining the insurable interest risks of purchasing life insurance policies. By comparing the policies within the portfolio, including their respective due diligence assessments, Ameritas may discover the Freid policy was not subjected to the same level of scrutiny as the others—that certain material facts were overlooked or ignored. It may discover that the risk level

12

assigned to the Freid Policy was inconsistent with the risk level assigned to similar policies. Or Ameritas may discover that the Freid Policy risk was worse (or at least no better) than the rest; that despite Vida's statement to the contrary, the Freid Policy risk was high, and it was grouped with lower risk policies to make the overall risk of the Project Alpha portfolio acceptable to a buyer. A review of the policies within the Project Alpha portfolio will reveal whether Vida was an innocent purchaser of the Freid Policy; whether it specifically and fully evaluated the risks of purchasing the Freid Policy and chose to accept the known or knowable risks associated with that purchase.

4)  Adequacy of Search performed by Wells Fargo and Vida

Wells Fargo and Vida assert they have disclosed all documents responsive to Requests 29 through 32 served on Vida, and Requests 22 through 25 served on Wells Fargo. Ameritas claims Wells Fargo and Vida did not perform a thorough search for the documents. Ameritas argues the search performed by Wells Fargo and Vida did not search for documents 1) for the entire relevant time frame, 2) from all relevant persons, and 3) as to electronically stored documents, using all relevant key words or phrases.

a.  The relevant time frame

Under Sun Life, "a party may be entitled to a refund of premium payments it made on a void STOLI policy, particularly a later purchaser who was not involved in any illicit conduct." Sun Life, 238 N.J. at 190, 208 A.3d at 859 (emphasis added). Vida, acting through its Securities Intermediary (Wells Fargo), is a "later purchaser" of the Freid Policy, and seeks recovery of all premiums paid for the Freid policy. Those premium payments date back to 2008; Vida paid

premiums starting after the policy was purchased in 2017 and continuing until Freid's death.

If Vida's premium payments were made when Vida knew or had reason to know the policy was an unenforceable STOLI policy, it may not be allowed to recover those payments as equitable relief. So, as to Vida's premium payments, the relevant time frame for a records search did not end on December 28, 2017. Moreover, Vida (and Wells Fargo in its capacity as Securities Intermediary for Vida) has not explained why Vida is entitled to recover all 13 years of premium payments when Vida made those payments for, at most, three years. See Ohio Nat. Life Assur. Corp. v. Davis, 803 F.3d 904, 911 (7th Cir. 2015) (holding an innocent STOLI purchaser is not entitled to all premium payments, but only those payments he himself made); Sun Life Assurance Co. of Canada v. Conestoga Tr. Servs., LLC, 263 F. Supp. 3d 695, 704 (E.D. Tenn. 2017), aff'd, 717 F. App'x 600 (6th Cir. 2018) (limiting the return of premiums to the innocent owner of a STOLI policy to the premiums paid after it acquired the ownership rights in the policy); PHL Variable Ins. Co. v. Lucille E. Morello 2007 Irrevocable Tr. ex rel. BNC Nat. Bank, 645 F.3d 965, 969 (8th Cir. 2011) (applying Minnesota law and holding that when an insured fraudulently induces the insurer to enter into a STOLI contract for insurance, the insurer is not required to return the premiums paid by the insured).

If Vida claims that in 2017, it received from Teleious all rights held by all prior policy owner(s), including any equitable right to receive reimbursement of premiums, then it is an assignee of those claims, stands in the shoes of those prior owners, and is subject to any defenses to the prior owners' claims—including the defense of unclean hands. See Dukes Bridge, LLC v. Sec. Life of Denver Ins. Co., No. 10-CV-5491-SJB, 2020 WL 1908557, at *74 (E.D.N.Y. Apr. 17, 2020), aff'd, No. 20-2687-CV L, 2021 WL 5986871 (2d Cir. Dec. 17, 2021),

and aff'd, No. 20-2687-CV L, 2021 WL 5986871 (2d Cir. Dec. 17, 2021). But if Vida is not the assignee of the rights to reimbursement of premiums paid by prior policy owners, Wells Fargo, as Vida's Securities Intermediary, cannot recover premiums that Vida did not itself pay. Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A., 44 F.4th 1024, 1038 (7th Cir. 2022), reh'g denied, No. 20-2339, 2022 WL 4463134 (7th Cir. Sept. 20, 2022).

Vida and Wells Fargo (in its capacity as Securities Intermediary for Vida) argue they should not be required to gather information from nonparties, and discovery requiring them to do so is unduly burdensome.

Responding to discovery is always a burden. The question is whether it is unduly so. Here, Ameritas claims the policy is void ab initio. It bears the burden of proving that. Vida is the party seeking reimbursement of premiums, including premiums it did not pay. As the party seeking reimbursement of all premiums paid by itself and all prior owners, Vida bears the burden of proof, and it must disclose its supporting trial evidence as required under Rule 26(a)(1). It must also answer all written discovery requests related to its premium reimbursement claims and any defenses to those claims—including those claims which Vida asserts as a successor and assignee of prior owners. Royal Park Investments SA/NV v. Deutsche Bank National Trust Co., 314 F.R.D. 341 (S.D.N.Y. 2016) (collecting cases).

Vida, the current beneficial owner of the Freid Policy, and Wells Fargo in its capacity as Securities Intermediary for Vida since 2017, cannot credibly state that they have fully responded to the discovery served. Their unilateral decision to limit Vida's search to only the January 1, 2017 to December 28, 2017 time frame was improper and far too narrow in light of the recovery they seek. Since Vida, and Wells Fargo as Securities Intermediary for Vida, are asking for all

premiums paid since the Freid Policy was issued, they must answer discovery for the entire relevant time frame—beginning with the policy application process and representations made at that time, and continuing throughout the time when premiums were paid.[5] As to their claim for reimbursement of payments made by prior owners, they must stand in the shoes of those prior owners and obtain responses to Ameritas' requested discovery from not only their own files and recollection, but also from prior owners who made the premium payments Vida now seeks to collect. In the alternative, Vida and Wells Fargo as Securities Intermediary can choose to forego any claim for reimbursement of payments Vida did not itself make.

### b.  Records custodians

Wells Fargo and Vida searched for responsive discovery from only those individuals who were responsible for administering the Freid Policy in 2017. But Vida is asking for reimbursement of premiums paid by all prior owners, including Freid and Teleios. Since the premium reimbursement claim dates back to the initial sale of the policy, the potential document custodians include:

- All persons principally involved in:

    -- negotiating, valuing, and applying for the Freid Policy;

    -- making representations before and during the policy application process;

    -- setting the premium rate (including but not limited to assessing Freid's likely remaining lifespan);

---

[5] Beginning in May 2011, Wells Fargo served as Securities Intermediary for not only Vida but at least one prior beneficial owner. In that capacity, Wells Fargo may be able to assert a claim for not only Vida but the former owners. But based upon the record, Wells Fargo is not attempting to recover on behalf of any entity other than Vida.

16

-- securing any premium financing and the payment terms for that financing;

-- issuing the policy; and,

-- valuing and making any payments to Freid for his involvement in securing the policy.

- All persons with primary understanding of each later beneficial owners' knowledge of:

-- the insurable interest risks of purchasing life insurance policies as of the date the purchase(s) was made or additional premiums were paid (including but not limited to the risks associated with policies produced by James Kergil, obtained through Michael Binday and his company, R. Binday Plans and Concepts, and owned by Michael Block, as trustee);

-- how that knowledge was used to evaluate the insurable interest risk of purchasing the Freid Policy specifically;

-- setting the value and cost to purchase the Freid Policy;

-- obtaining insurable interest related representations, warranties, and/or indemnities; and,

-- deciding whether additional premium payments should be made in light of the known or reasonably knowable risks at the time those payments were made.

In the alternative, Vida and its Securities Intermediary (Wells Fargo) can choose to forego any claim for reimbursement of payments Vida did not itself make. It could then limit its discovery responses to its own knowledge and involvement as a later beneficial purchaser when buying the Freid Policy and paying premiums to retain it.

c. Search terms and phrases

In addition to limiting the search to the January 1, 2017 through December 28, 2017 time period and to Vida personnel responsible for administering the

17

Freid Policy during that time period, Vida and Wells Fargo used only the following search terms or phrases to find electronically stored information:

Freid,

U000044736 (the number for the Freid Policy),

Ruby,

Binday,

Ameritas,

Union Central, and

("New Jersey" OR "NJ") AND "insurable interest"

This search effort was anemic at best. The court has reviewed the Boolean search terms suggested by Ameritas (Filing No. 115-7, at CM/ECF pp. 4-5),[6] and finds Ameritas' suggested search is reasonably calculated to locate relevant information for the purposes of discovery. Wells Fargo has presented no evidence explaining, with specificity, how it will be unduly burdened if required to

---

[6] The search terms are:

| | |
|---|---|
| "Binday" | "Teleios" or "Oaktree" |
| "Kergil" | "put option" OR "put agreement" |
| "U000044736" | "Bergman" OR "New Jersey Supreme Court" |
| "Freid" | "Price Dawe" OR "Delaware Supreme Court" |
| "HM Ruby" | "Binday" OR "Kergil" |
| "Gorham Holdings" or "Quantlife" | "insurable interest" |
| ("STOLI" OR "IOLI" OR "stranger-owned" OR "investor-owned" OR "stranger-originated") /10 "Advocate Brokerage" | ("STOLI" OR "IOLI" OR "stranger-owned" OR "investor-owned" OR "stranger-originated") /10 ("decision" OR "opinion" OR "judgment") |
| ("STOLI" OR "IOLI" OR "stranger-owned" OR "investor-owned" OR "stranger-originated") /10 "Wells Fargo" | ("STOLI" OR "IOLI" OR "stranger-owned" OR "investor-owned" OR "stranger-originated") /10 ("Delaware" OR "New Jersey") |
| ("STOLI" OR "IOLI" OR "stranger-owned" OR "investor-owned" OR "stranger-originated") /10 ("nonrecourse" OR "non-recourse") | ("STOLI" OR "IOLI" OR "stranger-owned" OR "investor-owned" OR "stranger-originated") /10 ("Coventry" or "GIII" or "LPC" or "BI" or "beneficial interest") |
| ("STOLI" OR "IOLI" OR "stranger-owned" OR "investor-owned" OR "stranger-originated") /10 ("premium financ*") | |

run this Boolean search, perform a document review, and produce the nonprivileged documents responsive to Ameritas' discovery requests. The court will order the search to be conducted as requested by Ameritas.

> In its opposition to Ameritas' motion, Wells Fargo argues:

> Ameritas's Motion to compel documents that are only relevant if the Policy is declared void is merely a subterfuge to mask Ameritas's own inequitable conduct and deep knowledge of the issues it raises in this lawsuit going back to 2013, or even earlier, when it learned of the practices of its agents and the facts on which its present refusal to pay the Policy death benefit is based.

(Filing No. 142, at CM/ECF p. 6). In other words, Wells Fargo argues the court should currently find that Ameritas' conduct was inequitable and as a result, prohibit Ameritas from obtaining discovery concerning the knowledge and conduct of Wells Fargo and Vida. But at the discovery stage, the court cannot decide the merits of a claim and from that decision, determine which party is entitled to discovery. Discovery is designed to allow all parties to obtain facts supporting their claims and defenses, thereby allowing all parties to present facts before the court and the finder of fact. More importantly, when equitable principles are involved, the court must balance those interests, comparing the conduct and knowledge of each of the parties and then deciding the proper outcome. So, even assuming Ameritas' conduct was inequitable, it is nonetheless entitled to discover evidence of Wells Fargo's inequitable conduct, if any. If neither party is blameless, the court will assess the parties' comparative culpability and decide which, if either, party is entitled to equitable relief.

For all the foregoing reasons, and consistent with the parameters discussed above, the court finds Ameritas' motion to compel, (Filing No. 114), should be granted.

19

II.     Wells Fargo's Motion to Compel

Wells Fargo moves to compel Ameritas' disclosure of documents described in Wells Fargo's privilege log at "entry Nos. 1-26, 38-46, 48-49, 51, 53-55, 57-190, 193-252, 254, 256-359, and 371, or, in the alternative, the Court should conduct an *in camera* review of the subject documents to determine that the in-issue doctrine applies to them." (Filing No. 120).

Wells Fargo argues that the documents listed on Ameritas' privilege log are no longer privileged because Ameritas placed the documents "in issue." "In this diversity case, we apply federal law to resolve work product claims and state law to resolve attorney-client privilege claims." Baker v. Gen. Motors Corp., 209 F.3d 1051, 1053 (8th Cir. 2000).

Under New Jersey law, "a privilege may be waived 'implicitly' where a party puts a confidential communication 'in issue' in a litigation." Columbus Life Ins. Co. v. Wilmington Tr., N.A., 344 F.R.D. 207, 223 (D.N.J. 2023). "[T]he party who places a confidential communication in issue voluntarily creates the 'need' for disclosure of those confidences to the adversary." State v. Mauti, 208 N.J. 519, 532, 33 A.3d 1216, 1224 (2012). Under Nebraska law, an implied waiver of the attorney-client privilege occurs if "assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party," and "through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case." Pamida, Inc. v. E.S. Originals, Inc., 281 F.3d 726, 731 (8th Cir. 2002) (citing League v. Vanice, 221 Neb. 34, 374 N.W.2d 849, 856 (Ne.1985)). So, under either Nebraska or New Jersey law, an in-issue waiver of attorney-client privilege occurs only if the party holding the privilege relies upon its attorney-client communications to assert a claim or defense.

20

Ameritas asserts the Freid Policy is void ab initio, and it asserts defenses to Wells Fargo's claim for reimbursement of premiums. As to its claims and defenses, Ameritas does not rely on its attorney-client communications as evidence and it did not make these communications relevant to the case. Likewise, it did not place its work product at issue. Ameritas has not waived its right to confidentiality under the attorney-client privilege and the work product doctrine.

The court has performed an *in camera* review of the documents requested by Wells Fargo. By separate filing, the court will identify to Ameritas the documents that it must disclose. Within 14 days of this ruling, Ameritas must either object to disclosure of those documents, or disclose the documents to Wells Fargo.

 Accordingly,

IT IS ORDERED:

1) Ameritas' motion to compel, (Filing No. 120), is granted as set forth in this order, and Wells Fargo/Vida must disclose the documents in accordance with this order no later than January 12, 2024.

2) As to Wells Fargo's motion to compel, (Filing No. 114), within 14 days of this ruling, Ameritas must either object to disclosure of the documents identified by the court (in a separate filing) as subject to release, or disclose those documents to Wells Fargo.

3) The parties' motion to continue, (Filing No. 166), is granted as follows:

   a. The trial and pretrial conference will not be set at this time. The status conference to discuss case progression, the parties' interest in settlement, and the trial and pretrial conference settings set for January 9, 2024 is **continued** and will be held with the assigned magistrate judge on **April 9, 2024** at **9:30 a.m.** by telephone. Counsel shall use the conferencing instructions assigned to this

case to participate in the conference.

b.   The deadlines for Defendant's complete expert disclosures for all experts expected to testify at trial, (both retained experts, (Fed. R. Civ. P. 26(a)(2)(B)), and non-retained experts, (Fed. R. Civ. P. 26(a)(2)(C)), is March 13, 2024.

c.   The deadline for fact witness depositions, including but not limited to depositions for oral testimony only under Rule 45, is February 28, 2024.

d.   The deadline for expert witness depositions, including but not limited to depositions for oral testimony only under Rule 45, is March 27, 2024.

e.   The deadline for filing motions to dismiss and motions for summary judgment is April 30, 2024.

f.   The deadline for filing motions to exclude testimony on *Daubert* and related grounds is April 30, 2024.

g.   Motions in limine shall be filed seven days before the pretrial conference. It is not the normal practice to hold hearings on motions in limine or to rule on them prior to the first day of trial. Counsel should plan accordingly.

h.   The parties shall comply with all other stipulations and agreements recited in their Rule 26(f) planning report that are not inconsistent with this order.

i.   All requests for changes of deadlines or settings established herein shall be directed to the undersigned magistrate judge, including all requests for changes of trial dates. Such requests will not be considered absent a showing of due diligence in the timely progression of this case and the recent development of circumstances, unanticipated prior to the filing of the motion, which require that additional time be allowed.

December 8, 2023

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

22